AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

MAY 2 4 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
One iPhone 10X, white in damaged black case; currently )
in the possession of the Federal Bureau of Investigation, )
10385 Vista Sorrento Parkway, San Diego, CA 92121 )

Case No.   **19MJ2184**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 USC § 371 | Conspiracy | |
| 15 U.S.C. § § 78j(b), 78ff, and | Securities Fraud | |
| 17 C.F.R. § 240.10b-5 | | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI SA Stephanie Schuld
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 5/24/19 _____

*Judge's signature*

City and state:  San Diego, California

U.S. Magistrate Judge Linda Lopez
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Stephanie Schuld, being duly sworn, do hereby depose and state as follows:

1.   I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since January 2010.   I am currently assigned to the San Diego Division's financial crimes squad.   Prior to working financial fraud cases, I spent more than four years investigating public corruption.

2.   Before I joined the FBI, I received a Bachelor of Arts degree in business with an emphasis in accounting and finance from Bethel University.   Following graduation, I was employed by a publicly-held Fortune 500 company as a Staff Accountant, Division Accounting Manager, and lastly, a Controller.   While at this company I gained more than five years of experience compiling and analyzing financial information.

3.   As a Special Agent, I received basic federal law enforcement training at the FBI Academy in Quantico, Virginia.   My training at the FBI Academy included instruction in how to conduct searches in accordance with the Fourth Amendment, the drafting of search warrant affidavits, and the probable cause standard.

4.   During my career as an FBI Agent, I have investigated various white collar crimes, including mail fraud, wire fraud, embezzlement, bribery, money laundering, public corruption, and conspiracy to commit these offenses.

5.   The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and records related to this investigation; recorded conversations with insiders; communications with

1  others who have personal knowledge of the events and circumstances
2  described herein; and information gained through my training and
3  experience. Because this affidavit is submitted for the limited purpose
4  of establishing probable cause in support of the application for a search
5  and seizure warrant, it does not set forth each and every fact that I
6  or others have learned during the course of this investigation.

7      6.    This affidavit is made in support of an application to search
8  the iPhone 10X, white with damaged black case (hereinafter referred to
9  as "SUBJECT TELEPHONE"); for items that constitute evidence, fruits, and
10 instrumentalities of violations of federal criminal law, namely,
11 conspiracy to commit securities fraud in violation of 18 U.S.C. § 371,
12 and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17
13 C.F.R. § 240.10b-5 occurring from July 1, 2017 through July 5, 2018.

14     7.    Based on my training and experience and the facts as set forth
15 in this affidavit, there is probable cause to believe that violations
16 of 18 U.S.C. § 371, and 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R.
17 § 240.10b-5 have been committed by the user of the SUBJECT TELEPHONE.
18 There is also probable cause to believe that a search of the SUBJECT
19 TELEPHONE (as more particularly described in Attachment A) will reveal
20 evidence of these crimes (as more particularly described in Attachment
21 B).

22              PROBABLE CAUSE SURROUNDING THE CRIMINAL CONDUCT

23 THE INDICTMENT IN THIS CASE

24     8.    On June 29, 2018, a federal grand jury sitting in the Southern
25 District of California handed down a sealed indictment against Andrew
26 Hackett, Vikram Khanna, Annetta Budhu, Kuldeep Sidhu, and Kevin
27 Gillespie. The case is docketed as United States v. Hackett, et al.,
28 18CR3072-BTM.   The indictment, which the Court has since unsealed,

1 charges defendants with conspiracy to commit securities fraud in
2 violation of 18 U.S.C. § 371, and securities fraud in violation of 15
3 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

4     9. The indictment alleges a conspiracy to conduct a market
5 manipulation and pump-and-dump scheme surrounding the stock of Arias
6 Intel Corp. (ticker symbol: ASNT), which began at least as early as
7 October 2017, and continued until in or about March 2018.

8 BACKGROUND

9     Pump-and-Dump Schemes Generally

10     10. Based on my training and experience, and from consultation
11 with other agents and securities regulators, I know that fraudulent
12 schemes surrounding the issuance, marketing, and trading of and in the
13 stock of small, thinly-capitalized (or "microcap") companies have been
14 widespread for years. Although these frauds vary in their particulars,
15 in a typical scheme conspirators (1) secretly obtain control over a
16 small company that has shares of stock that can be publicly traded, (2)
17 artificially inflate the price of the stock (the "pump") through
18 misleading corporate disclosures, call rooms, and stock promotion
19 techniques (including, for example, penny stock newsletters and internet
20 advertising), and (3) sell their stock into the rising market for
21 significant profits (the "dump"). Stock prices almost invariably go
22 down as a result of the dump, leaving innocent stockholders with
23 significant losses.

24     11. There are many aspects to a successful manipulation scheme,
25 including the following:

26         a. Reaching agreement on conspirator roles. Conspirators
27 often play various roles in market manipulation schemes. This is driven
28 by the development of particular competencies, and a desire to separate

3

1  activities so regulators and law enforcement have a harder time linking
2  all aspects of the scheme.  Some people may create, or obtain and clean
3  up, a corporate shell that is suitable for manipulation.   Others may
4  promote the stock through call rooms, internet pages, or penny stock
5  newsletters.  Still others may hold the conspirators' shares that they
6  will sell into the rising market and distribute the proceeds to the
7  conspirators.  All of these roles are essential to a successful scheme,
8  and conspirators sometimes reach an agreement on who covers what costs,
9  and how much of the proceeds will go to which conspirators.

10          b.    Controlling    the    company's    outstanding    shares.
11  Manipulators are more successful when they control larger blocks of free
12  trading shares.  This allows them to impact the market price more easily,
13  and decreases the chances that other market participants will place
14  downward pressure on the stock price while the conspirators are trying
15  to increase the price.

16          c.    Using  nominee  accounts.  Manipulators  almost  always
17  control bank and brokerage accounts, but often hold those accounts in
18  the name of other individuals or entities.  This hides the fact that,
19  e.g., those persons involved in the manipulation also manage and control
20  significant aspects of the business, and persons selling stock into a
21  rising market (the "dump") are also responsible for promotional efforts.
22  Spreading out the shares among a larger number of nominee accounts also
23  conceals that one person or group is responsible for most of the open-
24  market activity in a stock, and facilitates manipulative trading in the
25  stock.

26          d.    Press  releases  and  corporate  developments.   Stock
27  manipulators are able to sell the majority of their shares at relatively
28  high prices by getting innocent investors interested in the stock.

4

Conspirators often spend significant time developing an idea or product that the Company is supposedly pursuing. They then cause the company to issue press releases. These releases often have a nugget of truth that is exaggerated or presented in a misleading way. Press releases are often issued in conjunction with efforts to promote the stock in other ways.

e. Stock promotion. Stocks are sometimes promoted through high-pressure call rooms, stock newsletters, and advertisements on finance websites. The point of these efforts is the same as that of press releases - to get everyday investors interested in the stock, which will increase demand for the stock. This has two salutary effects: the stock's price and volume increase, and the conspirators have enough people to whom to sell their stock at inflated prices. Promotions often tout recent corporate disclosures as a reason to buy the stock.

f. "Building the chart." Conspirators commonly trade stock between two or more accounts that they control, and engage in other forms of manipulative trading. Seeing a recent history of increases in the price and volume of a given stock often incentivizes investors who have been exposed to promotions - investors who look up the stock chart on the internet can see upward trends that solidify their decision to invest in the company.

g. Controlled stock sales. Conspirators often seek steady, consistent and predictable movements in a stock's price and volume. They are able to get and keep investors interested in the stock if the price goes up steadily, as opposed to suddenly. This way, the conspirators can sell shares for longer periods of time, and ultimately sell more shares for higher prices, on average, than they can when there are dramatic swings in prices and volumes. Conspirators also seek to

avoid sudden shifts because they would rather not attract the attention of regulators and law enforcement.  Even during the promotional period, they also engage in manipulative trading to support the appearance of strong investor demand for the stock.

h.    Distributing the fraudulent proceeds.  One person or group of conspirators is often responsible for selling the conspirators' shares into the market.  They then often transfer money through intermediary accounts, many of them offshore, when distributing the proceeds to the conspirators who were responsible for other aspects of the scheme, e.g., the company's management or the shell broker.

The Individuals and Entities Involved

12.  According to recorded statements by Hackett and other defendants, Hackett was, during the scheme described herein, a citizen and resident of Canada, worked as a stock promoter in Canada, controlled Free Life Investments, Inc., and participated in the management and control of one or more accounts at domestic securities brokerage firms, and an account at an offshore brokerage firm (the "Offshore Brokerage Account", and collectively with the accounts at domestic brokerage firms, the "Brokerage Accounts").

13.  According to recorded statements by Budhu and other defendants, Budhu was, during the scheme described herein, a resident of New York, New York, brokered corporate shell companies, and was a representative of Arias Intel Corp.

14.  According to CHS (described further below) and recorded statements by Khanna and others, Khanna was, during the scheme described here, a resident of Porter Ranch, California, and worked as a stock promoter.  Khanna suffered from a combination of serious medical conditions, and died after the indictment in this case was handed down.

15.   According to recorded statements by Khanna, Sidhu was, during the scheme described herein, a resident of Canada, and participated in the management and control of at least one of the Brokerage Accounts that defendants intended to utilize to execute the scheme described herein.   After his arrest, Sidhu pleaded guilty in this case and is awaiting sentencing.

16.   According to recorded statements by Gillespie and Budhu, Gillespie was, during the scheme described herein, a resident of Tampa, Florida, worked at a securities brokerage firm prior to the scheme, and was the Chief Executive Officer of Arias Intel Corp.   After his arrest, Gillespie pleaded guilty in this case and is awaiting sentencing.

17.   CHS – CHS[1] has admitted to investigators that he has been involved in penny stock fraud for many years, and has had contact with many other repeat players in the industry.   CHS states that, since at least as early as 2016, he was involved in the promotion of stocks through TheMoneyStreet.com.   CHS and his associate, Gannon Giguiere, paid for advertisements on websites like Yahoo Finance, where a click on the ad links to a TheMoneyStreet.com landing page touting a particular stock. CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with

---

[1] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme relating to the 2012 manipulation Cuba Beverage Company.   When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice.   CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

1 defendants, and others, regarding the manipulation of many stocks,
2 including ASNT.

3     18.  According to its filings with the United States Securities and
4 Exchange Commission ("SEC"), Arias Intel Corp. ("Arias," the "Company,"
5 or "ASNT") was an entity incorporated in the state of Nevada, with its
6 principal place of business in Tampa, Florida.  It was formerly known
7 as First Harvest Corp. until on or about December 1, 2017, when it
8 changed its name to Arias Intel Corp.  Arias purported to be "a digital
9 media platform for tech, media and gaming, which includes mobile gaming,
10 augmented reality, on-demand delivery, digital and social media, and e-
11 commerce."

12 THE MANIPULATION SCHEME REGARDING ASNT STOCK

13     19.  CHS recorded dozens of phone calls with defendants in this
14 case.  He also captured hundreds of text messages and a significant
15 number of email messages with defendants.  In those calls, texts, and
16 emails, Hackett and others discussed many of the common aspects of a
17 market manipulation scheme, as described above, in connection with ASNT.

18     20.  On or about October 26, 2017, Khanna spoke by phone with CHS
19 about his agreement to promote ASNT stock with CHS, in exchange for 40
20 percent of the proceeds from the eventual sales of ASNT stock from the
21 Brokerage Accounts.  Defendant KHANNA also told CHS that, under the
22 agreement, defendant SIDHU would receive 10 percent of such proceeds.
23 Khanna inquired whether CHS was interested in participating in the
24 promotion of ASNT.

25     Control over Arias Intel Stock

26     21.  According to multiple recorded phone calls and text messages,
27 including between CHS and Hackett, Hackett acquired 200,000 shares of
28 ASNT stock, and expected to obtain additional shares.

22.  According to brokerage records obtained during the investigation, on or about August 8, 2017, Budhu, through an entity she controlled, sold to Hackett, through an entity he controlled, 200,000 shares of Arias stock pursuant to a stock purchase agreement.

23.  On or about August 10, 2017, HACKETT, through an entity he controlled, loaned ASNT $300,000 in exchange for one or more convertible short-term promissory notes.  The debt was convertible to ASNT stock.

24.  On or about November 2, 2017, Hackett and Khanna, along with CHS, spoke by phone.  On this call, Hackett suggested the conspirators distribute their ASNT shares to the Offshore Brokerage Account and other Brokerage Accounts, in part in order to obtain better trade execution.

"Building the Chart" through Manipulative Trading

25.  Based on my training and experience, and discussions with securities regulators, I know that one type of manipulative trading involves matched trades.  A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (a) creating a false or misleading appearance of active trading in any publicly traded security or (b) creating a false or misleading appearance with respect to the market for any such security.

26.  According to recorded phone calls and securities trading records obtained by the FBI, on or about the following days, defendant Hackett engaged in trading in ASNT stock:

| Date | Shares of ASNT Stock |
| --- | --- |
| December 22, 2017 | 4,000 |
| January 8, 2018 | 4,000 |
| January 9, 2018 | 2,180 |

| January 10, 2018 | 4,000 |
| January 12, 2018 | 2,200 |

These trades were transacted on the open market, but HACKETT nevertheless pre-arranged the trades with CHS's associate, who in fact was an undercover FBI agent, at prices that, according to recorded phone calls between the CHS and Hackett, were designed to artificially avoid the deflation of, maintain the price of, and inflate the price of, ASNT stock.

Corporate Disclosures

27.   According to an email received by CHS, on or about November 1, 2017, Gillespie sent to Budhu and Khanna an email listing topics that were expected to be the subject of forthcoming ASNT press releases.   On or about November 1, 2017, Khanna forwarded the email from Gillespie to CHS.

28.   On or about November 6, 2017, Khanna, Budhu, and Gillespie, along with CHS, spoke by phone.   On the call, Gillespie told the other call participants about a forthcoming ASNT press release.   The participants on the call also reached an understanding that press releases and promotional efforts "need to go hand in hand."

29.   On or about December 18, 2017, Budhu sent a message via Wire, an encrypted instant messaging app, to Hackett, Sidhu, and CHS, stating that an ASNT press release would be published by 1:30 that day, and asking "is there a preferred timing to release those [other press releases]."

30.   According to press releases identified by agents through internet searches, on or about the following dates, defendant GILLESPIE caused ASNT to publish the press releases on or about December 1 and 19,

2017, and January 4, 16, and 24 2018, most or all of which had been previewed by Gillespie in his November 1, 2017 email described above.

### Promotional Activity

31.  According to CHS, Gannon Giguiere (charged elsewhere) manages and controls a website known as TheMoneyStreet.com, which promotes certain companies and their stocks.  CHS assisted Giguiere in identifying stocks to promote on this website.

32.  According to multiple recorded phone calls, Khanna contacted CHS to promote ASNT stock on TheMoneyStreet.com; CHS spoke with each of the defendants, including with Hackett on many occasions, about promoting ASNT in this manner.  For example, on a recorded December 9, 2017 phone call, CHS encouraged Hackett, Budhu and Sidhu to visit TheMoneyStreet.com.  Hackett then stated: "Annetta [defendant Annetta Budhu], do you want to look at it?  I don't know if I've told you about it.  … They're doing NASDAQ deals.  They're doing another deal that's on the OTC but at five dollars.  They do all very nice deals."

33.  According to multiple recorded phone calls, Hackett told CHS that, in or about November and December 2017, Hackett caused a call room to sell ASNT stock to investors in exchange for a percentage of the investments made by such investors.

### False Statements to Securities Brokers

34.  On or about the following dates, Hackett, Budhu and Gillespie submitted seller's representation letters to ASNT's transfer agent, which letters falsely represented that "I have not made and do not propose to make any payment in connection with the offer or sale of the Shares to any person or entity except any customary broker's commission or dealer's charges.  I have not solicited or arranged for the

solicitation of orders to buy in anticipation of or in connection with the proposed sale pursuant to such order, and I will not do so."

| Date | Signatory |
|------|-----------|
| August 4, 2017 | Defendant Gillespie |
| August 28, 2017 | Defendant Budhu |
| August 31, 2017 | Defendant Hackett |

### Sales of ASNT Stock

35. On or about December 9, 2017, defendants Hackett, Sidhu and Budhu, along with CHS, spoke by phone. On the call, the participants discussed the price at which they would begin selling the conspirators' ASNT stock into the market, and agreed on a price of $5 per share.

### The E*Trade Issue

36. According to multiple recorded phone calls, the conspirators executed on several aspects of the ASNT scheme, but mostly abandoned the ultimate promotion of the stock, primarily because E*Trade, a brokerage firm used by many microcap stock investors, would not allow online buy orders in the stock.

### PRIOR CONTACT BETWEEN HACKETT AND DEFENDANT BUDHU

37. Evidence obtained during the course of the FBI's investigation of this case include emails between Hackett and Budhu. These emails appear to concern Hackett's interest in acquiring control of another company (i.e., not ASNT) with publicly-traded shares. These emails also appear to show that Budhu was acting as a broker for the transaction, based on the fact that the seller in the transaction documents (which were attached to the emails) was not Budhu or any entity known to be associated with Budhu. These emails are dated as early as April 2017. Based on my training and experience, the content and context of these emails (including discussion of the size of share blocks Hackett sought

to obtain, and the parties in whose name the stock should be transferred) strongly suggest there was substantive prior communication between Hackett and Budhu concerning a transaction surrounding this other company.

38. Additionally, Hackett made statements to the FBI after his arrest that he first met Budhu when he purchased a shell from Budhu approximately two years prior.

PROBABLE CAUSE SURROUNDING THE SUBJECT TELEPHONE

39. The SUBJECT TELEPHONE was seized from Hackett by the FBI on July 5, 2018, at the time Hackett was arrested pursuant to the indictment in this case.

40. Hackett (who lived in Canada, according to his own statements on telephone calls with CHS and brokerage records obtained during the investigation) and CHS (who lived in Northern California) communicated frequently over the course of the ASNT scheme. The first call between Hackett and CHS regarding ASNT took place on November 2, 2017, and a call about a manipulative trade in ASNT took place on February 13, 2018. These communications occurred, during several periods, multiple times per day, and included communications about stock holdings, issues surrounding trading through E*Trade, promotions and press releases regarding KVMD. CHS and Hackett communicated both about ASNT and a significant number of "deals" involving other microcap stocks from late 2017 until the time of Hackett's arrest. These communications included a significant volume of phone calls, emails, and text messages, including messages transmitted via one or more encrypted messaging platforms, such as the "Wire" and "WhatsApp" messaging apps. On recorded calls about the ASNT scheme, Hackett stated on multiple occasions that he was

1 | travelling, was planning to travel, or recently travelled, away from his
2 | home.

3 |     41.   Hackett gave to CHS a specific phone number by which CHS could
4 | communicate with Hackett.  CHS used this phone number to contact Hackett,
5 | and Hackett called CHS from this number, throughout the ASNT manipulation
6 | scheme described above.  This same number was associated with Hackett's
7 | WhatsApp account.  After the SUBJECT TELEPHONE was seized, the FBI called
8 | the number that Hackett gave to CHS, and the SUBJECT TELEPHONE rang.

9 |     42.   Hackett stated to CHS that Hackett used additional encrypted
10 | apps, including "Silent Circle" and "Telegram," to communicate with
11 | individuals involved with other "deals."

12 |     43.   Based on my training and experience, the encrypted apps
13 | Hackett used to communicate with CHS and others are often used on a cell
14 | phone, and these apps are readily available in the relevant app stores.

15 | PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

16 |     44.   It is not possible to determine, merely by knowing the cellular
17 | telephone's make, model and serial number, the nature and types of
18 | services to which the device is subscribed and the nature of the data
19 | stored on the device.  Cellular devices today can be simple cellular
20 | telephones and text message devices, can include cameras, can serve as
21 | personal digital assistants and have functions such as calendars and
22 | full address books and can be mini-computers allowing for electronic
23 | mail services, web services and rudimentary word processing.    An
24 | increasing number of cellular service providers now allow for their
25 | subscribers to access their device over the internet and remotely destroy
26 | all of the data contained on the device.  For that reason, the device
27 | may only be powered in a secure environment or, if possible, started in
28 | "flight mode" which disables access to the network.    Unlike typical

14

1  computers, many cellular telephones do not have hard drives or hard
2  drive equivalents and store information in volatile memory within the
3  device or in memory cards inserted into the device.  Current technology
4  provides some solutions for acquiring some of the data stored in some
5  cellular telephone models using forensic hardware and software.  Even
6  if some of the stored information on the device may be acquired
7  forensically, not all of the data subject to seizure may be so acquired.
8  For devices that are not subject to forensic data acquisition or that
9  have potentially relevant data stored that is not subject to such
10  acquisition, the examiner must inspect the device manually and record
11  the process and the results using digital photography.  This process is
12  time and labor intensive and may take weeks or longer.

13      45.  Following the issuance of this warrant, I will collect the
14  subject cellular telephone and subject it to analysis.  All forensic
15  analysis of the data contained within the telephone and its memory card
16  will employ search protocols directed exclusively to the identification
17  and extraction of data within the scope of this warrant.

18      46.  Based on the foregoing, identifying and extracting data
19  subject to seizure pursuant to this warrant may require a range of data
20  analysis techniques, including manual review, and, consequently, may
21  take weeks or months.  The personnel conducting the identification and
22  extraction of data will complete the analysis within ninety (90) days,
23  absent further application to this court.

24                          REQUEST FOR SEALING

25      47.  This is an ongoing investigation, the full nature and scope
26  of which the targets are unaware.  It is very likely, based upon the
27  above, that evidence of the crimes under investigation exists in physical
28  form and on computers and servers subject to the control of the targets.

                                15

There is reason to believe, based on the above, that premature disclosure of the existence of the warrants could result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court.

## CONCLUSION

48. Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, and will be found at the telephone to be searched as provided in Attachment A.

Special Agent Stephanie Schuld
Federal Bureau of Investigation

Subscribed and sworn to before me this **24** day of May, 2018.

HONORABLE LINDA LOPEZ
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

PROPERTY TO BE SEARCHED

One iPhone 10X, white in damaged black case; currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Parkway, San Diego, CA 92121 (the "Subject Telephone").

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the SUBJECT TELEPHONE described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT TELEPHONE. The seizure and search of the SUBJECT TELEPHONE will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT TELEPHONE will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of August 1, 2017 to March 31, 2018:

a.   Tending to identify attempts to manipulate the market for the stock of Arias Intel Corporation (the "Subject Company"), including attempts to:

   1. Obtain control of or the stock of the Subject Company.

   2. Conceal control of the Subject Company or stockholding in the Subject Company.

   3. Impact the price or trade volume of stock in the Subject Company.

   4. Create or revise corporate disclosures.

   5. Promote the Subject Company or the stock of the Subject Company, including through call rooms, newsletters, or websites, including but not limited to, www.TheMoneyStreet.com.

      6. Buy or sell the stock of the Subject Company.

      7. Distribute proceeds from the sale of the stock of the Subject Company.

b. Tending to identify accounts, profiles, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the manipulation of the stock of the Subject Company.

c. Tending to identify payment, payment methods, or other monetary transactions relating to manipulating the stock of the Subject Company.

d. Tending to identify co-conspirators, criminal associates, or others involved in manipulating the stock of the Subject Company.

e. Tending to identify travel to or presence at locations involved in manipulating the stock of the Subject Company.

f. Tending to identify the user of, or persons with control over or access to, the SUBJECT TELEPHONE.

g. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

h. Provide context to any of the communications, records, or data described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

The seizure and search of the cellular phone(s) shall follow
the procedures outlined in the supporting affidavit.